Good morning, Ms. Moss. I see you reserved three minutes for rebuttal, and you can begin whenever you're ready. Thank you. Good morning, and may it please the Court, my name is Andrea Rasmy, the plaintiff in an employment discrimination case. This case presents three distinct clear questions. One, did the district court apply the wrong standard when it decided to allow or enforce, rather, the Judiciary 475 lien? Two, on this record, coercive settlement pressure, abusive communications, and demonstrable lack of ordinary skill and care, was the district court required to at least have a hearing on the issue of whether the attorney was dismissed for cause? And three, even if the district court concluded that a lien was enforceable here, did the district court err when it did not have a hearing on the attorney's fees that were presented by the plaintiff's discharged attorney? Mr. Dieter. Can I ask you, I'm having a hard time understanding why you think the district court applied the wrong legal standard. It cited both New York law and our prior case law that you have to show impropriety or misconduct on the part of the attorney, and that differences of opinion, you know, are not enough. So where did the district court get the standard wrong? The district court essentially found, as you said, no misconduct and that it was no impropriety. However, the correct standard, which has been applied consistently in other circuit cases and the cases that we cite in our brief, includes other factors, such as factors. I looked at those cases. They're all district court cases, and they just have like a list, a laundry list, a catalog of types of misconduct that can exist. Correct. I'm not suggesting that the district judge has to go through every potential form of misconduct that could take place in legal representation and explain why it doesn't apply here. The district court actually went through the allegations that your client made of a specific misconduct. There was no sabotaging of the case. There was no tampering with files. We filed the document properly at the court. There was a footnote about another allegation of misconduct. So the district court was clearly looking at the alleged misconduct in this case and saying, I don't think it's misconduct. These are just differences of opinion. So I don't think the district court has to go through a laundry list of all potential misconduct in the world, right? I believe that under the cases cited in our brief and also cited by this court in the Stare case, that they do have to go through and look at some of the factors that might contribute to some of the essential elements, which are loss of confidence. I don't understand. It's not any loss of confidence. A client has an attorney doesn't mean the attorney can be discharged for a cause. Just because someone loses confidence in their attorney, it could be their problem, not the attorney's problem. Absolutely correct. So there has to be a loss of confidence from some mishandling of the case or some impropriety. So what was the impropriety and mishandling of the case that you think the district court didn't address? The impropriety was that under New York Client's Bill of Rights and under New York law, it's often cited in these cases that the client has the ultimate right to decide whether to settle a case. In this case, the discharged attorney made it absolutely clear that there was only one choice, which was settle, and that he had no clear path, meaning the discharged attorney saw no clear path to winning a trial. He based that upon an erroneous calculation, which was he decided that the only thing that mattered. That's not misconduct. Even if he was wrong about that, that the individual defendant wasn't judgment-proof, he was preparing for the trial. It wasn't as if he said, I won't represent you unless you take this settlement or I'm not preparing for the trial because I don't think you should go to trial. He was simultaneously preparing for the trial while strongly urging his client to settle the case. I think that's what he said. With all due respect, Your Honor, he was telling his client that he had a 0 percent chance of winning. He was calling his client's witness and telling them that they will be destroyed on the stand, that there's a 0 percent chance that he would win. In other words, the client was left with going with an attorney who said he saw no way he could win. That witness that you're talking about, didn't that witness produce documents saying that your client was frightening and dangerous? There was definitely a lot of different things. There definitely were some problems. That would impair somebody's utility as a witness, I would think. That is true. However, the fact of the matter is that trial counsel did come in and did bring this case to trial and did Did trial counsel call that witness? Yes. And not only that, but the whole analysis of the fact that the individual defendant was judgment-proof and the sole focus on the corporate defendant was an incorrect way of analyzing the case as worn out by the ultimate trial verdict and then settlement, which is under seal, but in which the plaintiff receives considerably more than the district judge. I don't see counsel saying, I will not go to trial. Counsel says, I see zero chance of winning. If you That's not a refusal to go to trial. As I'm reading the record, the lawyer who ultimately took this case to trial used the preparation, at least in part, that was done by the lawyer who has been awarded $100,000. Well, with all due respect, this case has been ongoing for 10 years, and he was only in the case 8 months. And when he arrived on the scene Well, I don't know how long any of the other judges were in, but as I see it, there's like at least a dozen lawyers who were discharged by your client or left and fled from the case. So he's the one who prepared the case for trial, and the trial resulted in a six-figure recovery. I would disagree that he prepared the case for trial. What he did when the case was moved to the new counsel, he sent a very long screed about how the client was going to lose and focused entirely on the corporate defendant. Doesn't his billing record show that he was preparing for the trial? Doesn't it show a lot of work on trial prep? No, it does not. It shows a lot of work after he was terminated. It shows $26,000 billed after he was terminated. And wasn't he helping prepare the next counsel to try the case? No. What he did was he presented the new counsel. I see my time is up. May I? Yeah, sure. What he was doing was he gave the new counsel a memo, which is part of the record, which explained all the reasons why he was going to lose a trial, not at all focusing on what ultimately ended up being the way in which the plaintiff prevailed, which is by focusing on individual defendants. In that regard, this attorney was spectacularly wrong, and he ended up getting considerably more than the attorney was trying to force him to take. Without going into detail of the settlement terms, how did it happen that the case settled for appreciably more than the trial verdict? Well, first there was the trial verdict, and then it included attorney's fees. And so there was a settlement in front of the Second Circuit mediator, I believe, that was brought about by a number of the attorneys who all got together and ended up resolving the case. The discharged attorney did not want to participate in that, and so he did not.  So the increment beyond the verdict represents attorney's fees? Yes, to a certain extent, yes. Thank you. On the issue of a hearing, New York law says if there's a factual dispute, you're entitled to a hearing. But you didn't request the – there was no request for a hearing in the district court. So the district court's judge, Sue Esponte, said even though both sides were submitting the affidavit submitted, obviously a lot of e-mails that pretty much spell out what the nature of the dispute was. So why did the district court abuse its discretion in having a hearing when there was no request for one? Isn't that – I think that's already a slave. You can't argue to us there should have been a hearing when you didn't request one in the district court. We did request that the court review the attorney's fees records, and we did request that the court allow us to be heard on the issue of whether the discharge was for cause. Well, that's just being heard on the issues. You never said – and we think you can't resolve this based upon the numerous e-mails we've submitted and the declarations from both sides. You need to have an evidentiary hearing where you can evaluate credibility. Nobody said – nobody even opened the papers. It's not the word hearing. I request a hearing, like an evidentiary hearing, not that the matter be heard. I understand what you're saying. It was our understanding that, based upon the case law, that a hearing would be required under these circumstances because there was a contested issue of whether it was for cause or not. Nobody ever – There's a lot of New York law that says it depends on the circumstances. It's not automatic. I understand that. I think under these circumstances, a hearing was warranted, given the fact that the client was given no choice because he had an attorney who said that he could see no path to victory in his trial. Okay. Thank you. Thank you. All right. Mr. Diederich. Good morning, Your Honors. Michael Diederich, representing myself. Mr. Rasby decided he wanted to play Russian roulette. I had – Well, that's a game that lawyers play. I spent countless hours trying to get a case from him. And at the end of the day – Let me ask you this. Did – I'll say you because you're representing yourself. Did you ascertain whether any of the individual defendants were indemnified by Marriott? I – they were – there was one counsel representing all defendants. So I presume – In discovery – I presume – In discovery, it's common to find out whether there's insurance and how much insurance there is and whether there's indemnification. I was retained after discovery was concluded, Your Honor. I was only retained to try the case. Now, I was retained only to try the case. I ended up doing some supplemental discovery, motion practice. So that answers my question. Yeah. I also, notwithstanding what the counsel just said, I put together a trial memorandum for my successor because I had an interest in the case. I wanted Mr. Rasby to win. I just thought that he could not reasonably win against Marriott and the other. And he didn't. And he didn't. And if he had also lost against Stamatis, the other – the party he did prevail against, if he had lost the whole case, he would have been faced with – I think he already had a $60,000 court order sanctions against him. He could have been also liable for not only cost but potentially attorney's fees. He could have been very much in the hole had he lost. And we had $250,000 on the table. I thought it was just totally unreasonable for him to – That was the first offer. Was that the first offer that was made? No, no. They had started 90. I eventually got them up to 250. I probably could have got them up a little bit more. But by that time, Mr. Rasby lost. I don't know how he lost. He – I can't explain some clients, Your Honor. He thought he could win. And remarkably, he did win against one defendant. But, you know, that person could have been judgment-proof. And, you know, so I advised what I advised. I strongly advised that he settle because of the consequences had he lost, which would have been devastating for him and his family. And I was still willing to go forward. I prepared the case. I prepared jury instructions. I outlined for the new counsel what I thought were the weaknesses. And as far as I – Was that done after the termination of your services? Yes, Your Honor, in the transition, exactly. I did it so that they would – Let me ask you about the amount that the district court awarded. The district court said it was fair and reasonable to give you $100,000 because it was below the one-third recovery of the $400,000 and because you were seeking $133,000 in fees. So, you know, because it was lower than both of those, it was fair and reasonable. But that's not really what New York case law suggests. It says, obviously, the percentage agreement is one factor. But then it lists what the court should consider in terms of being fair and reasonable. That's the nature of the litigation, the difficulty of the case, the time spent, the amount of money involved, the results achieved, the amounts customarily charged for similar services. And the district court, first of all, didn't cite that law and did not address their argument in their papers that your fees were excessive. So, hypothetically, if your fees were excessive and under analysis should have only been $50,000 or $75,000, that, you know, wouldn't have been fair and reasonable. It seems like the district court just accepted your estimation of your fees based on your billing records without analyzing their claim that it was excessive in a number of respects. Well, Your Honor, first off, I think I put it in my papers. I was asserting an account stated that I had given Mr. Azmi my billing in advance. He didn't contest them as we're going along. I'm just saying the district court didn't analyze that. Do you agree or disagree? Did the district court analyze whether or not your hours and what you were doing was excessive or not? Did the district court analyze that? I think he did. I didn't think he saw it excessive and he had the records. And also, Your Honor, I think you need to distinguish between the two. Well, they didn't cite you where in their papers before the district court they argued that even if you should get a charging lien, that what you were seeking was excessive. And they give examples before us. They didn't cite these before the district court. But, for example, 185 hours after you were terminated could potentially be excessive, right? That's a lot of time after someone says you're fired, right? Your Honor, I don't think I had any excessive time in the case. But can I point out that – Well, explain to me what 185 hours was over eight days after you were fired. What did you do for 180 hours during that period of time? I don't think I billed for after I was fired, Your Honor. I think I billed – I put together the time that my office and I put into the case. And I'd like to point out, Your Honor, as far as fees go – You billed only 25 hours in a day. What was that about? They say you billed 25 hours in a day. I don't think that that's – I recorded 25 hours in a day. And if it was a time billing that I accumulated from other – my clerk, my paralegal, my other attorney working on the case, if I assembled some of those in an item, yeah, then that's just a clerical mistake on my part. But I'd like to point out, Your Honor – Let me just – just one thing I want to clarify, because one of the points that Judge Bianco made, so are you saying that the $133,000 submission, whatever the exact precise number is, did not include any time post-termination? I don't – The records reflect the time afterwards. I don't think I billed for any time after termination. That's not what the records reflect, at least my recollection. Okay. And, Your Honor, I think it's important for me to point out that this was a contingency case that I took on a basis of potential fee shifting. And there's a difference between if a court is evaluating me making a fee request to Marriott, the opposing counsel, where you do want to scrutinize whether the fees are reasonable. On a fee shifting basis, it would be $133,000, correct? Well, on a fee shifting case, I would ask for attorney's fees from the other side. Also, by the way, Your Honor, you have the settlement agreement. It's in the field. You can look at the dollar amount of what was finally settled and determine whether my portion of the fee is reasonable. Well, one-third of $400,000 would be $133,000, correct? Your Honor, there was more than $400,000 in this case. And I requested a look at the sealed document that you have, which sets it forth. I just, as a matter of courtesy. But if it were four, one-third would be $133,000. Right. And I agreed. And what was the total amount of your charges based on time? $130,000. I think it was $133,000 approximately. Actually, I'm looking at, I think it was $122,000, $185,000. Less than $133,000. Around there. And I waived all amounts above $100,000 for the purpose of, I thought I was settling the case with the other parties. So I waived everything above $100,000. And that's what I did. And I would respectfully. Well, the question I wanted to ask you about, because I understand that the district court was sort of certainly satisfied that there was certainly an entitlement and that there wasn't termination for cause. One of the issues was this question about whether you were abusive towards the client. And one of the things in terms of looking at some of the case law, I noticed that, you know, there was another case, FERC, where some of the same allegations had come against you. I'm just sort of wondering, is there some pattern or issue or something that You're right. I've been practicing law for a long, since 1981. I have had a lot of clients. Every now and then, a client may like to dispute a fee or whatnot. I have satisfied clients. I have never had any grievances. You know, I dispute, you know, that I was in any way unprofessional. And if, listen, I'm a human being. If in a conversation with Mr. Rasmey, I got, you know, I don't know. I don't know. I'm not suggesting one thing or the other. I'm just curious. In this FERC case, which was a relatively recent case, and what the judge sort of said there, sort of after review there, that they thought it certainly reflected a hostile relationship. So, I mean, I'm not sure it rises to the level of cause, and I think there's obviously determination that Judge Rakoff made, but I just. In the FERC case, Your Honor, as I recall, it was still on papers. It was allegations from the client. I have, you know, occasionally clients make crazy allegations. They may go to a grievance committee. I have not ever had a grievance committee filed against me. So I just dispute any of it. If I was in the Marine Corps before I became an Army officer, if some of my language might have accidentally slipped out on one instance, I can't say it might not have, but I don't think that rises to the level. I think that was an attempt at persuasion to get a client to do what was in the client's best interest, which is always what I try to do. And, again, getting back to fees. The loan start. You did bill 26 hours for September 30th of 2022. I'm looking at your billing records. You billed 26 hours for that day. So what, you didn't sleep that day? What happened that day? Your Honor, I would have to look at it and see how that happens. I'm just suggesting that the district court appeared not to look at that at all. Well, but, Your Honor, if — But district court judges aren't supposed to accept the billing records and say, well, he's only asking for 100. His billing records say 122. That seems fair and reasonable. That's not what district court judges are supposed to do. You're supposed to look at the fees, the entries. You're supposed to look at your billing rate, your hours spent, what your entries say, and determine if that's a fair and reasonable amount, and then compare it to the contingency, one-third, and come up with an overall assessment, and it appears not to have happened. Well, Your Honor, again, I can't — I don't have it right in front of me, and I can't explain that. I try, in good faith, to record my hours and put them down, and, again, on a contingency fee basis, which I'm taking all risk on a case, on a contingency fee case. And here, if you'll — I request, Your Honors, to look at the sealed settlement agreement, where you'll see the actual amount, and you'll see my, you know, percentage is quite — quite reasonable, just on a contingency fee basis. And — All right. Yeah. I don't know what else I can say.  Fair enough. Thank you very much. Ms. Mosh, you have three minutes in rebuttal. Thank you, Your Honor. Just initially on the issue of indemnification, discovery was not closed when Mr. Dedrick took on the case. And, in fact, he attended a partial deposition, and, you know, his billing records also reflect that there was discovery going on. There was no reason why he couldn't simply inquire about whether the individual defendant was going to be indemnified by Marriott. That's information that's regularly provided by corporate defendants. Also, I think that a review of the records that were provided by Mr. Dedrick in terms of his billing reveals that — first of all, they're not very long, right? It's only 10 pages or so. And it would have been fairly easy for the district court to review these and see that there were some basic problems with them. And if nothing else, there should be a hearing on that. Also, you cited in our brief the 26 hours in a day. You didn't mention that to the district court. You did challenge the excesses of this overall, but you did a much better job on appeal of pointing to examples. Yes. Yes. It would have been better if you raised those with the district court, right? Yes. Correct. Correct. But given the fact that this is — we're not talking about voluminous records. We're talking about 10 pages. It's fairly obvious that these billing records are in error. Also, if you look at the Under Seal Settlement Agreement, you'll see relative to what the other attorneys — Is there any challenge to Mr. Dedrick's observation that he had other people in his office working on the case, not for nothing? So that if he worked 12 hours and they worked 12 hours, it would be 24 hours. Well, that's not what the record on that date in particular reflects. It reflects work all done by Mr. Dedrick. So he does have a — And did you bring that specifically to the attention of the judge? We didn't have — no, we did not bring — we did not go — we focused on the fact that there should — that the discharge was for cause and that the billing records were excessive and, frankly, anticipated that the court would have a hearing on the issue of the billing records and the discharge. And I would just point out quickly that the paralegal work was billed after discharge 163 hours, one block bill after Mr. Dedrick was discharged for $16,000. So he did, in fact, bill for paralegal work in a separate entry. All right. Thank you very much.  Thank you, both of you. It was our decision. Have a good day. Thank you.